Renee GARRETT, Margaret McCoy, and
Marna Williamson,
Plaintiffs-Appellees,

and

Lurena Hughes, Plaintiff-Appellee,
Cross-Appellant,

v.

OKALOOSA COUNTY, Defendant,

and

Larry Gilbert, individually and in his official capacity as Sheriff of Okaloosa County, and Frank J. Mills, individually and in his former official capacity as Sheriff of Okaloosa County, Defendants-Appellants, Cross-Appellees.

No. 83–3327.

United States Court of Appeals,
Eleventh Circuit.

June 18, 1984.

Julius F. Parker, Jr., Tallahassee, Fla., for defendants-appellants, cross-appellees.

Brian Norton, Tallahassee, Fla., for plaintiffs-appellees.

Before HILL and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by defendants-appellants Frank Mills and Larry Gilbert, who were past and present sheriffs, respectively, of Okaloosa County, Florida, from a judgment that they violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Equal Pay Act, 29 U.S.C. § 206(d)(1) with respect to plaintiff-appellees, four past and present female employees of the Okaloosa County Jail. Defendants claim that the district court erred in failing to find that their actions were justified under the bona fide occupational qualification (BFOQ) defense to Title VII, and in finding a violation of the Equal Pay Act. One of the plaintiffs, Lurena Hughes, cross-appeals, asserting that the award to her of backpay was erroneously limited by the district court. We affirm on the issues raised by defendants, and reverse and remand on the cross-appeal by plaintiff Hughes.

## I. BACKGROUND

Plaintiffs initially were hired as matrons/dispatchers at the Okaloosa County Jail. In 1977, plaintiff Margaret McCoy was trained and certified by the state of Florida as a correctional officer. Following her certification, McCoy, who continued in her position as a matron/dispatcher, began complaining to her supervisors that she was not receiving the same pay as her male co-workers who were correctional officers. McCoy requested that she be reclassified as a correctional officer, but was informed by the chief jailor that women would not be considered for any correctional officer vacancies at the Okaloosa County Jail. In March, 1979, plaintiffs Renee Garrett, Lurena Hughes, and Marna Williamson completed correctional officer training and certification. During their training courses plaintiffs discovered that women in other Florida county jails were employed as correctional officers. Following their certification, Williamson and Garrett personally requested reclassification as correctional officers, but were informed that no women would be considered for that position. Hughes also desired reclassification, but made no personal request because she knew from the response received by the other plaintiffs that such a request would be futile.

Plaintiffs continued to complain about the county's failure to reclassify them, and in August 1980 they wrote a joint letter to Sheriff Mills, formally requesting jobs as correctional officers. Plaintiffs received no response from Sheriff Mills. In January and March, 1981, plaintiffs again complained to the new sheriff, Sheriff Gilbert, about unequal and discriminatory employment practices. Gilbert responded that he could do nothing about unequal pay until the new fiscal year began in October, 1981. Nevertheless, Gilbert did reclassify plain-

tiffs as correctional officers, beginning with Hughes in February, and McCoy and Garrett on April 1, 1981.[1] The district court found that from these dates forward, the performance of plaintiffs' jobs required skill, effort, and responsibility equal to that of their male co-workers, under similar working conditions. Nevertheless, plaintiffs continued to be paid less than their male counterparts until the date judgment was entered against defendants.

Plaintiffs initiated this suit in the United States District Court for the Northern District of Florida at about the time they learned that despite their reclassification as correctional officers, their pay would remain less than that of male correctional officers at the jail. The district court found that defendants discriminated against plaintiffs on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by refusing for several years to promote them to positions as correctional officers—jobs they were qualified to perform—from their positions as matrons/dispatchers with the jail. The district court further found that defendants violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), by not paying the plaintiffs the same wage as their similarly situated male counterparts after plaintiffs were reclassified as correctional officers. The district court dismissed the bulk of plaintiffs' Equal Pay Act claims, which contended that during the period that plaintiffs were matrons/dispatchers, they were entitled to the same pay as male correctional officers. The district court found that the duties of a matron/dispatcher were not substantially equal to those of a correctional officer, and that therefore no Equal Pay Act violation was established. Moreover, the district court held that Title VII was better suited than the Equal Pay Act to address plaintiffs' claims of discrimination during the period they held positions as matrons/dispatchers despite their qualifications as correctional officers. The district

court further determined that the individual defendants were liable only in their official, and not their individual, capacities. Following a separate trial on damages, the district court entered judgment totaling approximately $15,000, to be apportioned among the plaintiffs.

## II. ISSUES

Defendants raise two issues on appeal, and plaintiff Hughes has cross-appealed one issue. Defendants first assert that the district court erred in failing to find that their actions were justified on the basis of a bona fide occupational qualification (BFOQ). Second, defendants contend that the district court erred in finding an Equal Pay Act violation after April 1, 1981. Hughes cross-appeals the district court's computation of her backpay.

## III. DISCUSSION

### A. *The BFOQ Defense*

Defendants claim that prior to 1981 they could not assign plaintiffs to positions as correctional counselors at the Okaloosa County Jail because of a state regulation that mandatorily required that:

> When a male person must enter the female section of a detention facility where a female is confined, a matron or female employee will accompany him, and *when a female person must enter the male section of a detention facility where a male is confined a male employee will accompany her.*

Fla.Admin.Code, § 33.8.05(6) (emphasis in appellants' brief). That regulation was amended in May, 1981[2] and now reads:

> Male and female prisoners must be housed separately and also separated by sight and normal sound. Sound separation is defined as restricting normal verbal communications. When a male must enter a female housing area he will do so only when accompanied by a female cor-

---

1. Williamson resigned from her position at the Okaloosa County Jail on March 11, 1981.

2. Defendants contend that they promoted plaintiffs when the regulation was changed, although the record shows that the promotions occurred one to two months before the change.

rectional officer or other female person designated by the officer in charge unless any emergency situation would dictate otherwise.

Fla.Admin.Code, § 33–8.03(2).

Defendants seem to believe that the prior regulation created an outright bar on the use of female correctional officers in male inmate facilities. Thus, they argue that they were prohibited from using plaintiffs in the male portion of the Okaloosa County Jail, which contained 95% of the inmates at the jail. Additionally, defendants argue that there was no need for one or more full-time female correctional officers to care for the small proportion of female inmates at the Okaloosa County Jail. Rather, a "matron" with additional duties as a dispatcher was sufficient to care for the female inmates. Therefore, defendants assert that they were justified by a BFOQ in hiring females as "matrons" to guard female prisoners exclusively, and males as correctional officers to guard male prisoners exclusively.

█ Defendants' argument is meritless. First, the old regulation relied upon by defendants did not *prohibit* female correctional officers from guarding male inmates. Rather, the regulation was sexually neutral on its face, requiring a male to accompany a female in a male inmate facility *and* vice versa. Second, even if the old regulation did prohibit using female correctional officers in male inmate facilities, defendants would bear the burden of proving that the regulation was legitimate. *See Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). The mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation.

█ To prove a BFOQ, the employer must show that sex is a qualification "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e). The BFOQ defense has been construed very narrowly to apply "only when the *essence* of the business operation would be undermined by not hir-

ing members of one sex exclusively." *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 (5th Cir.1971) (emphasis in original). Here, the evidence at trial showed that other Florida counties were using female correctional officers long before the regulation changed. Additionally, defendants came forth with no evidence that the use of female correctional officers in Okaloosa County following the regulation change in 1981 has in any way hindered the efficient operation of the Okaloosa County Jail. For an occupational qualification to be "bona fide," it must be just as valid and necessary one day as it is the next. Yet, defendants argue, in effect, that the same women who apparently are working out well as correctional officers today would not have worked out prior to 1981, with the same qualifications. We cannot accept that argument.

### B. *Equal Pay Act Violation*

█ At trial, plaintiffs contended that from February and April 1981, when they fully assumed duties as correctional officers, to the time judgment was entered, they received less pay than similarly situated male correctional officers. The district court agreed with plaintiffs and ordered the parties to agree on the actual pay differentials involved. In compliance with that order, the parties stipulated to salary figures that showed a clear equal pay violation. Following the damages phase of trial, however, defendants attempted to refute the stipulated figures by pointing to unobjected to testimony of one defense witness. The district court offered defendants' counsel an opportunity to reopen the trial to resolve the alleged discrepancy between the stipulation and the testimony, but defendants' counsel declined that opportunity.

Defendants now argue that the district court erred in finding an equal pay violation because the testimony at trial refuted the stipulated figures. We hold that defendants waived their opportunity to raise this issue on appeal when they declined the

district court's generous offer to reopen the trial.

### C. *Computation of Backpay for Hughes*

In her cross-appeal, Hughes contends that the district court erred when it limited her backpay to the period commencing in August, 1980, rather than the period beginning in March, 1979. Although Hughes, Williamson, and Garrett all completed their correctional officer training and certification in March, 1979, the district court awarded only Williamson and Garrett backpay to March, 1979, because they personally requested reclassification then. The district court awarded Hughes backpay only to August, 1980, at which time she first personally requested reclassification by joining the other plaintiffs in a letter to Sheriff Mills. The district court did find, however, that Hughes was interested in reclassification as early as Williamson and Garrett. Moreover, the district court found that Hughes did not request reclassification prior to August 1980 because she believed such a request would be futile.

Hughes argues that the finding that she was interested in a position as a correctional officer as early as March, 1979, coupled with the finding that she believed (with good reason, based on the experience of her co-workers) that it would be futile to apply for the position, is sufficient to entitle her to backpay from the earlier period. We agree. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362–71, 97 S.Ct. 1843, 1868–1873, 52 L.Ed.2d 396 (1977).

Accordingly, the judgment of the district court is AFFIRMED with respect to defendants' appeal, and REVERSED with respect to plaintiff Hughes's cross-appeal to permit a new determination of her backpay award.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.