Thomas DOWNEY, Plaintiff,

v.

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 1262, United Food and Commercial Workers Union, Vitale Enterprises, Inc.—Foodtown Supermarkets, Kenneth Heller, John McElroy, and Luis Cordero.

Civil Action No. 96–874 (AJL).

United States District Court,
D. New Jersey.

Oct. 2, 1996.

Diane C. Nardone, Elise Rossbach, Jemas, Nardone & Burnside, Newark, NJ, for Plaintiff.

Carmine R. Alampi, Anthony X. Arturi, Jr., Smith, Don, Alampi, D'Argenio & Arturi, Englewood Cliffs, NJ, for Vitale Enterprises, Inc., Kenneth Heller, and John McElroy.

Bernard N. Katz, David A. Gaudioso, Meranze and Katz, Camden, NJ, for United Food and Commercial Workers Union Local 1262, AFL–CIO.

Luis Cordero, Belleville, NJ, Pro Se.

## OPINION

LECHNER, District Judge.

This is a wrongful termination action brought by plaintiff Thomas Downey III ("Downey") against defendants United Food and Commercial Workers Union Local 1262 ("Local 1262"), the United Food and Commercial Worker's Union ("UFCW"), Vitale Enterprises, Inc.—Foodtown Supermarkets, ("Vitale"), Kenneth Heller ("Heller"), John McElroy ("McElroy") and Luis Cordero ("Cordero") (collectively, the "Defendants"). Jurisdiction over the first count of the complaint is alleged pursuant to 29 U.S.C. § 185. Downey alleges supplemental jurisdiction over the remaining counts.

On 5 March 1996, Downey filed a seven count amended complaint (the "Complaint"). Downey alleges claims of breach of the collective bargaining agreement, wrongful termination, breach of the duty of fair representation, unlawful discrimination pursuant to N.J.S.A. § 10:5–1 et seq., false arrest, false imprisonment, defamation and intentional interference with employment. Downey seeks compensatory and punitive damages, attorney's fees, costs of suit and other such equitable relief as deemed proper.

On 29 August 1996, the Defendants submitted two separate motions, pursuant to Rule 12N, Appendix N ("Rule 12N") of the General Rules for the District of New Jersey. Defendants Vitale, Heller and McElroy (the "Vitale Defendants") submitted a combined Motion for Summary Judgment Dismissing Plaintiff's Claims Against Them and For Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") (the "Vitale Motion for Summary Judgment" and the "Vitale Motion for Sanctions"). Defendant Local 1262 submitted a Motion to Dismiss Amended Complaint and For Summary Judgment (the "Local 1262 Motion for Summary Judgment").[1]

---

1. In support of the Motion for Summary Judgment and for Sanctions Pursuant to Rule 11, the Vitale Defendants submitted: Defendants' Notice of Motion for Summary Judgment and Dismissing Plaintiff's Claims Against Vitale Supermarkets, Inc., Kenneth Heller and John McElroy ("Vitale Notice of Motion"); Brief of Defendants, Vitale Supermarkets, Kenneth Heller and John McElroy, In Support Of Their Motion For Summary Judgment Dismissing Plaintiff's Claims Against Them and For Sanctions Pursuant To Rule 11 ("Vitale Moving Brief"); Anthony X. Arturi, Jr.'s Certification of Counsel In Support of Defendants' Motion For Judgment ("Arturi Cert."), dated 2 July 1996, with Exhibits A through S attached; Anthony X. Arturi, Jr.'s Certification of Counsel In Support Of Defendants' Motion for Judgment Per Defendants' Reply Brief ("Arturi Reply Cert."), dated 19 August 1996, with Exhibits T through Z, AA through DD attached; Reply Brief Of Defendants' Vitale Supermarkets, Kenneth Heller, And John McElroy In Support Of Their Motion For Summary Judgment ("Vitale Reply Brief"); Vitale Defendants'

Rule 12G Statement of Undisputed Facts ("Vitale 12G Statement"); Anthony X. Arturi, Jr.'s Affidavit In Opposition To Plaintiff's Rule 56f Application ("Vitale Rule 56f Statement").

In support of the Local 1262 Motion for Summary Judgment, Local 1262 submitted: Defendants' Notice of Motion For Summary Judgment And Dismissing Plaintiff's Claims Against Union Local 1262 ("Union Notice of Motion"); Defendant United Food And Commercial Worker Local 1262's Brief In Support Of Motion to Dismiss Amended Complaint And For Summary Judgment ("Local 1262 Moving Brief"); Certification Of David A. Gaudioso In Support of Defendants' Motion To Dismiss Amended Complaint And For Summary Judgment ("Gaudioso Cert."), dated 14 August 1996, with Exhibit Appendix A through K attached; Defendant United Food And Commercial Workers' Reply Brief To Plaintiff's Brief In Opposition To Defendants Motion For Summary Judgment ("Local 1262 Reply Brief"); Defendant United Food And Commercial Workers' Statement of Material Facts Pursuant To Rule 12G (adopting Vitale 12G Statement); De-

For the reasons stated below, the Vitale Motion for Summary Judgment and the Local 1262 Motion for Summary Judgment are granted. The Vitale Motion for Sanctions is denied. The remaining state law claims of Downey against the Defendants are dismissed without prejudice.

*Facts*

A. *The Parties*

Downey is a citizen of the State of New Jersey residing in Hudson County. In April 1993, Vitale hired Downey as a part-time bookkeeper for its Foodtown Supermarket in Kearny, New Jersey (the "Kearny Foodtown"). Complaint, ¶ 11. Downey became a full-time employee in November 1994 and remained a full-time employee until he was terminated on or about 26 May 1995.[2] Complaint, ¶ 11–12. When hired, Downey became a member with the UFCW and Local 1262. Complaint, ¶ 13. Downey remained in good standing with UFCW and Local 1262 at all times relevant to the Complaint. Complaint, ¶ 1.

UFCW and Local 1262 are unincorporated labor associations organized to represent the interests of their members and to negotiate collective bargaining agreements. Complaint, ¶ 2. Local 1262 maintains an office at 1389 Broad Street in Clifton, New Jersey. The UFCW maintains an office at 1775 K Street, N.W., Washington, D.C. Complaint, ¶ 2.

Vitale is a corporation organized and existing under the laws of the State of New Jersey. Complaint, ¶ 3. Vitale owns the Kearny Foodtown at which Downey was employed. Complaint, ¶ 3. Vitale maintains an office at 9 Bi–Plaza, Old Tappan, New Jersey. Complaint, ¶ 3.

Heller is an individual who resides in Old Tappan, New Jersey. Heller was employed by Vitale as Director of Loss Prevention. Complaint, ¶ 4. Downey alleges at all times relevant to this action, Heller was working with the knowledge and consent of Vitale. Complaint, ¶ 4. Downey alleges Heller has recently been reassigned to the position of assistant store manager. Deposition of Richard Plishka ("Plishka Dep.Tr."), dated 30 July 1996, attached to Nardone Cert. as Exhibit 3; attached to Arturi Reply Cert. as Exhibit U, 7:15–23.

McElroy is an individual who resides in Kearny, New Jersey. Complaint, ¶ 5. McElroy was employed in the capacity of a security officer by Vitale. Complaint, ¶ 5. Downey alleges that at all times relevant to this action, McElroy was acting on behalf of and with the consent of Vitale. Complaint, ¶ 5.

Cordero is an individual who resides in Belleville, New Jersey. Complaint, ¶ 6. Cordero was employed as a cashier at the Kearny Foodtown. Complaint, ¶ 6. The employment of Cordero at Kearny Foodtown commenced in the Fall of 1994 and terminated on or about 24 May 1996. Complaint, ¶ 6.

B. *Discovery and Investigation of the Fraudulent Credit Card Charges*

In early 1995, Vitale became aware that fraudulent credit card charges ("Fraudulent Credit Card Charges") were being processed

---

fendant United Food And Commercial Workers Union Local 1262's Affidavit In Response To The Rule 56f Affidavit Of The Plaintiff ("Local 1262 Rule 56f Statement"); Proposed Forms of Order.

In opposition to the Motion for Summary Judgment, Downey submitted: Plaintiff's Brief in Opposition to Defendant's Motions for Summary Judgment ("Opposition Brief"); Certification of Diane C. Nardone ("Nardone Cert."), dated 7 August 1996, with Exhibits 1 through 37 attached; Certification of Elise P. Rossbach ("Rossbach Cert."), dated 7 August 1996; Plaintiff's Rule 12G Statement ("Downey Rule 12G Statement"); Rule 56f Affidavit for Continuance of Motion Returnable September 9, 1996 ("Downey Rule 56f Statement"); Plaintiff's Affidavit of Service.

2. The Grievance Report filed by Downey on 7 June 1995 indicates Downey was suspended on 2 June 1995. UFCW Local 1262 Grievance Report, dated 7 June 1995, attached to Gaudioso Cert. as Exhibit C. The Police Report, dated 2 June 1995 (the "2 June 1995 Police Report") prepared by Michael Cinardo ("Cinardo") indicates Heller told him Downey had been discharged. 2 June 1995 Police Report, attached to Nardone Cert. as Exhibit 6. Cinardo testified in his deposition (the transcript of which was not submitted by Downey) Downey told him he had been discharged. This disputed fact is not material to preclude the grant of summary judgment.

at the Kearny Foodtown. Transcript of Proceedings, Hudson County Grand Jury Indictment No. 64–01–96, *New Jersey v. Thomas Downey and Luis Cordero* ("Grand Jury Tr."), dated 14 December 1996, attached to Gaudioso Cert. as Exhibit C, 3:9 to 4:13. The matter was investigated by Heller, Director of Loss Prevention at Vitale. Grand Jury Tr. 3:12–15. Heller discovered the Fraudulent Credit Card Charges were not processed in the usual manner by swiping the purchaser's card through the machine. Grand Jury Tr. 3:17–24. Instead, the transactions were manually punched into the machine by a cashier. Grand Jury Tr. 3:17–24. The cashier number on the Fraudulent Credit Card Charges was that of Cordero. Grand Jury Tr. 4:16–18.

On or about 31 May 1995, Heller interviewed Cordero at the Kearny Foodtown about the Fraudulent Credit Card Charges. 8 August 1996 Deposition of Kenneth Heller ("Heller Dep.Tr."), attached to Arturi Reply Cert. as Exhibit W, 140:13–14; Deposition of Luis Cordero ("Cordero Dep.Tr."), dated 25 July 1996, attached to Nardone Cert. at Exhibit 4; attached to Arturi Cert. as Exhibit V, 44:5–18. Heller questioned Cordero for approximately one hour. Cordero Dep.Tr. 50:15–17. Cordero admitted to fraudulently processing the credit card transactions and taking the corresponding amount of cash from the register till. Cordero Dep.Tr. 21:17 to 35:25.

Cordero testified that, during the interview, Heller threatened him both physically and emotionally. Cordero Dep.Tr. 53:13–18. Cordero contends Heller threatened to arrest him and threatened to call his parents to inform them Cordero was a homosexual and a thief. Cordero Dep.Tr. 53:13–18. Cordero testified Heller used derogatory language when he referred to Downey and Cordero as homosexuals. Cordero Dep.Tr. 57:11 to 59:11. Cordero contends Heller promised he would not press charges or call his parents if Cordero promised to cooperate. Cordero Dep.Tr. 53:20 to 54:54:1. Cordero testified Heller said he wanted a statement from Cordero so that the owner of the Kearny Foodtown could fire Downey. Cordero Dep. Tr. 83:15 to 83:21. Heller denies threatening Cordero during his interview and denies promising Cordero that Foodtown would not press charges if Cordero implicated Downey. Heller Dep.Tr. 265:11–12.

Cordero wrote a two page statement on 2 June 1995 apologizing for his actions and implicating Downey in the Fraudulent Credit Card Charges.[3] Cordero Dep.Tr. 44:22 to 46:25; Handwritten Confession of Luis Cordero ("Cordero Confession"), dated 2 June 1995, attached to Arturi Cert. as Exhibit M.

### C. *Downey's Discharge and Arrest*

On or about 2 June 1995, Heller, accompanied by McElroy, interviewed Downey about the Fraudulent Credit Card Charges at the Kearny Foodtown. Opposition Brief at 6; Vitale Moving Brief at 6. Downey testified Heller and McElroy sat on either side of him at a table, blocking his egress from the room. Deposition of Thomas Downey ("Downey Dep.Tr."), dated 16 July 1996, attached to Nardone Cert. as Exhibit 5; attached to Arturi Reply Cert. as Exhibit T, 50:3 to 51:12. Downey testified he requested several times the opportunity to leave but his requests were ignored by Heller and McElroy. Downey Dep.Tr. 58:1 to 59:9. Downey testified Heller verbally threatened him with jail time. Downey Dep.Tr. 59:10–12. Downey indicated he was afraid Heller or McElroy would become physical with him because of incidents he had witnessed previously be-

---

**3.** During his deposition, Cordero testified Downey would ask Cordero if Downey could scan his credit card through the machine so that Cordero could give him money from the register. Cordero Dep. Tr. 21:22–24. Cordero would refuse, but allowed Downey to process the transaction while Cordero was away from the register on his break. Cordero Dep. Tr. 21:25 to 23:2. Downey would give Cordero a credit card slip at the end of his shift. Cordero Dep. Tr. 23:2–11. Cordero testified Downey told Cordero he was using other people's credit cards. Cordero Dep. Tr. 34:17–18. Cordero testified Downey told Cordero he could not get caught because Downey took care of all the money in the store. Cordero Dep. Tr. 26:18–21. After Downey convinced Cordero he would not be caught, Cordero also began using other credit cards to process fraudulent transactions and take money from the register. Cordero Dep. Tr. 35:25. Cordero testified he would share the money he took from the register with Downey. Cordero Dep. Tr. 40:18–19.

tween Heller or McElroy and other people. Downey Dep.Tr. 59:10–25. Following the interview, Heller and McElroy escorted Downey from the store. Opposition Brief at 7.

Later in the day on 2 June 1995, Heller went to the Kearny Police Department and reported a theft from Kearny Foodtown in the amount of $3,049.81. Heller implicated Downey and Cordero in the theft. Investigation Report by Kearny Police, dated 2 June 1995, attached to Nardone Cert. as Exhibit 6.

Detective Michael Cinardo ("Cinardo") met with Cordero at the Kearny Police Department on 3 June 1995. 3 June 1995 Police Report, attached to Nardone Cert. as Exhibit 6. Cordero contends Heller was also at the Kearny Police Department and spoke with Cordero prior to his meeting with Cinardo. Cordero Dep.Tr. 48:11 to 49:5. Cordero testified Heller told him to "answer [the questions] the way that I'm supposed to answer [the questions]." Cordero Dep.Tr. 48:11 to 49:5. Heller allegedly indicated to Cordero that no charges would be pressed against Cordero and that he would not go to jail. Cordero Dep.Tr. 48:11 to 49:5. Thereafter, Cordero provided a statement to Cinardo implicating Downey in the Fraudulent Credit Card Charges. 3 June 1995 Police Report.

Downey contends Heller falsely represented to Cinardo that Downey had worked on all occasions when the Fraudulent Credit Card Charges occurred. Cinardo Police Report Notes, attached to Nardone Cert. as Exhibit 9.[4] Downey contends Cinardo testified Heller referred to Downey and Cordero as "lovers" and "queers." Opposition Brief at 9.[5]

On 7 June 1995, Downey voluntarily appeared at the Kearny Police Department and was charged with forgery and theft by decep-

tion. 7 June 1995 Arrest Report, attached to Nardone Cert. as Exhibit 10.

On 10 June 1995, Heller interviewed another Kearny Foodtown cashier, Joy SanFilippo ("SanFilippo")[6], regarding a Fraudulent Credit Card Charge that was processed on 12 May 1995.[7] Opposition Brief at 10. Downey contends Heller extracted a statement from SanFilippo that implicated Downey in that incident. Opposition Brief at 9. During her interview with Heller, SanFilippo indicated Downey was the bookkeeper on duty when Cordero used the cashier number of SanFilippo to manually enter a credit card charge of $312.14. Opposition Brief at 9–10. At a later date, SanFilippo reviewed the appropriate time records and realized she was mistaken and Downey was not the bookkeeper on duty. Opposition Brief at 10. SanFilippo testified she believed her statements to be true at the time she made them on 10 June 1995. Opposition Brief at 10–11.[8]

On 21 June 1995, Heller provided the Kearny Police Department with additional information regarding Fraudulent Credit Card Charges on 5 May 1995 and 12 May 1995. 23 June 1995 Police Report, attached to Nardone Cert. as Exhibit 16. Detective Vincent Thomas ("Thomas") informed Heller that not enough evidence existed to charge Cordero in those incidents. Nardone Cert. at Exhibit 16. Heller then signed a complaint against Cordero for the original incident. Nardone Cert. at Exhibit 16. Ramon de la Cruz, the Hudson County prosecutor who handled the criminal action against Downey and Cordero, testified Heller objected to the disposition of the case through administrative remand and Heller wanted the case to go to the Grand Jury. 25 July 1995 Deposition of Ramon de la Cruz ("Cruz Dep.Tr."),

---

4. The Police Report Notes state that it was "verified Downey working on all occasions of theft" but do not indicate who verified the information. Nardone Cert. at Exhibit 9.

5. The transcript for the Cinardo deposition was not submitted by Downey to support this statement. The excerpts from the 6 August 1996 Deposition of Michael Cinardo ("Cinardo Dep."), attached to the Arturi Reply Cert. as Exhibit X, do not reference this statement. Heller denied making these statements. Heller Dep. Tr. 225:16 to 226:14.

6. There is a discrepancy in the submissions regarding the spelling of SanFillipo.

7. The transcript for the SanFilippo deposition was not submitted.

8. These unsworn facts are provided for background and are not relevant to the disposition of the instant motions.

attached to Nardone Cert. as Exhibit 19, 37:12 to 38:16.

On 14 December 1995, Heller testified before the Grand Jury about the incidents surrounding the Fraudulent Credit Card Charges. Grand Jury Tr. 3:7 to 8:5. Downey alleges Heller perjured himself when he testified that a manager number was required to override the manual entry of a credit card. Opposition Brief at 13. The procedure of using a manager number to override a manual entry of a credit card was instituted three days after the last Fraudulent Credit Card Charge was made. 15 May 1995 Vitale Memorandum, attached to Nardone Cert. as Exhibit 21.

### D. *The Filing of the Downey Grievance*

On 7 June 1995, Downey met with Peter Smith ("Smith"), the business representative for Local 1262, to prepare a grievance report (the "Grievance Report"). 7 June 1995 Local 1262 Grievance Report, attached to Nardone Cert. as Exhibit 22. The Grievance Report was filed with Joseph Emerson, store manager at Kearny Foodtown. 28 March 1996 Affidavit of Peter M. Smith ("Smith Aff."), attached to Gaudioso Cert. as Exhibit B; attached to Nardone Cert. as Exhibit 23, ¶ 5.[9]

On 29 June 1995, Smith met with George DuBose ("DuBose"), a Assistant Field Director of Local 1262, Richard Plishka, Director of Human Resources at Vitale and Heller (the "29 June Meeting"). Smith Aff., ¶ 8. Although Downey was invited to the 29 June Meeting, he did not attend. Smith Aff., ¶¶ 7–8.

At the 29 June Meeting, Heller and Plishka showed Smith and DuBose the documentation which traced the Fraudulent Credit Card Charges back to Cordero. Smith Aff., ¶ 9. Heller and Plishka told Smith and DuBose that Downey, as a bookkeeper, had to have knowledge of fraud, otherwise he was not properly following company procedures on balancing out the credit card vouchers at the registers. Smith Aff., ¶ 9. Smith and DuBose also received a copy of the Cordero

statement implicating Downey, which was taken by the Kearny Police. Smith Aff., ¶ 9.

On 6 July 1995, Smith and DuBose again met with Plishka and Heller. Smith Aff., ¶ 13. Downey was also present. Smith Aff., ¶ 13. Plishka told Smith and DuBose that there had been 14 Fraudulent Credit Card Charges and Downey and Cordero were working on each of the days they occurred. Smith Aff., ¶ 13. The Vitale representatives did not have any documentation at the meeting to demonstrate Downey was personally involved, but indicated they would provide it. Smith Aff., ¶ 13.

Another meeting was held on 14 July 1995. Smith Aff., ¶ 16. Downey was invited but did not attend. Smith Aff., ¶ 16. Plishka and Heller could not provide documentation implicating Downey because, pursuant to company policy, the sheets recording the reconciliation of each register close out were destroyed the following day. Smith Aff., ¶ 16.

Smith met with Martin Vitale ("Martin Vitale"), the President and Chief Executive Officer of Vitale, on 17 July 1996. Smith Aff., ¶ 17. Smith told Martin Vitale that it could not be established Downey participated in the Fraudulent Credit Card Charges. Smith Aff., ¶ 17. At best, Vitale would only be able to prove Downey violated company accounting procedures by not informing the company of the volume of credit card transactions. Smith Aff., ¶ 17. Smith told Martin Vitale the violation of company accounting procedures did not warrant termination of employment under the "proper cause" provisions of the collective bargaining agreement (the "Vitale CBA"). Smith Aff., ¶ 17. Smith negotiated a settlement with Vitale whereby Downey received two-thirds of his back pay and reinstatement to his position at the Hoboken Foodtown (the "Settlement Agreement"). Smith Aff., ¶ 17. Downey did not receive full back pay because Vitale believed the failure of Downey to follow the company accounting procedures warranted some discipline.[10] Smith Aff., ¶ 17.

---

9. Smith had not yet been deposed by counsel for Downey at the time of the filing of the instant motions. The Smith Affidavit was submitted by Local 1262. The facts presented in the Smith Affidavit are provided for background and are not material to the disposition of these motions.

10. Downey contends that although other bookkeepers cashed out Cordero on the days he was

Prior to the end of the meeting, Martin Vitale was reminded that a Foodtown in Union City had been closed. Smith Aff., ¶ 17. In accordance with the Vitale CBA, Downey, as the least senior full-time employee, had the option of accepting a lay-off or being reduced to part-time status. Smith Aff., ¶ 17. The Settlement Agreement, therefore, had Downey reporting to the Hoboken Foodtown as a part-time employee.[11] Smith Aff., ¶ 18.

At the conclusion of the meeting, Smith called Downey and informed him of the Settlement Agreement. Smith Aff.; ¶ 18. Smith and Downey arranged to meet on 21 July 1995 (the "21 July Meeting") at the office of Local 1262 so that Downey could sign the grievance release (the "Grievance Release"). Smith Aff., ¶ 18. Downey was placed on the work schedule at the Hoboken Foodtown. Smith Aff., ¶ 18; Vitale Work Schedule, attached to Arturi Reply Cert. as Exhibit AA.

On the day of the 21 July Meeting, Downey informed Smith he could not attend. Smith Aff., ¶ 19. Downey indicated his attorney wanted Vitale to drop the criminal charges against him prior to his signing the grievance.[12] Smith Aff., ¶ 19. Downey was removed from the work schedule at Hoboken Foodtown pending a determination of when Downey could sign the Grievance Release. Smith Aff., ¶ 19–20.

Another meeting was scheduled between Smith and Downey for 26 July 1995 (the "26 July Meeting"). Smith Aff., ¶ 21. On the day of the 26 July Meeting, Downey informed Smith he would not attend any meeting unless accompanied by his attorney, who was on vacation until 1 August 1995. Smith Aff., ¶ 21. Smith told Downey that, as far as

Smith was concerned, the grievance had been satisfactorily resolved because he had been placed back to work. Smith Aff., ¶ 21. Downey never indicated, prior to 26 July 1995, that he objected to the Settlement Agreement. Smith Aff., ¶ 21. Smith told Downey he needed an answer as to whether he was going to sign the Grievance Release. Downey indicated he would contact Smith with his decision later that day, but he never did. Smith Aff., ¶ 21.[13]

On 27 July 1995, Louis Marcucci ("Marcucci"), Field Director for Local 1262, sent a letter to Downey. 27 July 1995 Letter of Louis Marcucci (the "27 July Letter"), attached to Nardone Cert. as Exhibit 25; attached to Arturi Cert. as Exhibit I; attached to Gaudioso Cert. as Exhibit E. The 27 July Letter stated, in relevant part,

> This is to advise you that we have received a settlement offer from your Employer concerning the grievance of your discharge. It is the practice of UFCW Local 1262 to communicate such an offer to the affected grievant in person.
>
> . . . . . . .
>
> We are anxious to meet and discuss with you the company's proposed settlement in order to get your position before UFCW Local 1262 decides how it will proceed. Unless you notify us by August 2, 1995 that you will be meeting with us, we will decide on whether to accept or reject the settlement proposal without having your position on the matter.

27 July Letter.

By a letter, dated 2 August 1995 (the "2 August Reply Letter"), addressed to Smith and DuBose, Downey, through his attorney, rejected the Settlement Agreement. 2 Au-

---

making fraudulent transactions, no other bookkeepers had been reprimanded for failing to comply with company accounting procedures. Opposition Brief at 19. Downey provides no certification to support this contention.

**11.** Downey contends there was evidence to indicate that he was not the least senior employee and that there were part-time employees with less seniority. Plishka Dep. 93:8–96:24. Downey argues the failure of Local 1262 to investigate his seniority status is further evidence of the breach of the duty of fair representation. Oppo-

sition Brief at 30, 33–34. The Vitale Defendants and Local 1262 point out that nothing in the Vitale CBA requires the Vitale to lay off multiple part-time employees to create a full time position. Local 1262 Reply Brief at 10.

**12.** The Defendants contend the criminal charges against Downey were processed solely by the Kearny Municipal Prosecutor's Office, beyond the control of Local 1262.

**13.** These facts are not contested by Downey.

gust 1995 Reply Letter, attached to Nardone Cert. as Exhibit 26; attached to Arturi Cert. as Exhibit J; attached to Gaudioso Cert. as Exhibit F. The 2 August Reply Letter stated, in relevant part,

> I have been retained to represent Thomas Downey in connection with all civil matters relating to Mr. Downey's employment and wrongful discharge from Foodtown Supermarkets. From this date forward, any and all communications with my client must be made through me.

> . . . . .

> My investigation into the injustices Foodtown inflicted on my client establishes that nothing short of unconditional restatement, all back pay, plus compensatory damages is acceptable.

> . . . . .

> If you intend to make any effort to protect Mr. Downey's rights in accordance with the union agreement, contact me and I will be happy to assist. If you cannot assure me of your intent to help Mr. Downey within the next ten (10) business days, I will take whatever action is necessary to protect his rights for him.

2 August Reply Letter.

On 7 August 1995, Howard Simonoff ("Simonoff"), attorney for Local 1262, called the attorney for Downey to discuss the Settlement Agreement. 7 August 1996 Certification of Elise P. Rossbach ("Rossbach Cert."), ¶ 11. Simonoff told the attorney for Downey that Downey was not entitled to a full-time position at Hoboken Foodtown because of the closing of the Foodtown in Union City. Rossbach Cert., ¶ 11. Downey's attorney requested Simonoff produce proof that Downey was the least senior employee justifying the reduction to part-time status. Rossbach Cert., ¶ 12.

On or about 14 August 1995, Simonoff called the attorney for Downey and provided the names of several people who had been laid off or reduced to part-time employment. Rossbach Cert., ¶ 13. Simonoff did not produce any information to confirm if Downey was least senior to warrant the reduction in status. Rossbach Cert., ¶ 13.

By letter, dated 22 August 1995, Simonoff informed Downey that he would be deemed to have abandoned his job unless he reported to work on 28 August 1995. Rossbach Cert., ¶ 14; 22 August Letter of Howard Simonoff ("22 August Simonoff Letter"), attached to Nardone Cert. as Exhibit 27; attached to Arturi Cert. as Exhibit Q. On 24 August 1995, the attorney for Downey sent a letter to Simonoff advising Simonoff that Downey would not report to a part-time position. Rossbach Cert., ¶ 15; 24 August 1995 Letter of Elise Rossbach ("24 August Rossbach Letter"), attached to Nardone Cert. as Exhibit 28; attached to Arturi Cert. as Exhibit R. The 24 August Letter also demanded Local 1262 refer the matter to arbitration. 24 August Rossbach Letter. By letter, dated the same day, Simonoff indicated:

> UFCW Local 1262 sees no reason to go to arbitration for an employee who can have his job back plus $2,000 and who is refusing to return to that job.

24 August 1995 Letter of Howard Simonoff ("24 August Simonoff Letter"), attached to Nardone Cert. as Exhibit 29. Downey did not appeal the disposition of the grievance.

There are twelve Fraudulent Credit Card Charges at issue in this action. Opposition Brief at 18. Downey contends the evidence demonstrates he was either not working or working in a different department on six of the twelve days when the Fraudulent Credit Card Charges occurred. Opposition Brief at 18; Thomas Downey Time Sheets, attached to Nardone Cert. as Exhibit 31. Although other bookkeepers had cashed out Cordero on days he made the Fraudulent Credit Card Charges, none of the other bookkeepers were questioned by Vitale. Opposition Brief at 19. Downey alleges no other bookkeepers had been reprimanded for failing to follow company accounting procedure in monitoring credit card transactions. Downey also contends there is no evidence, other than the statement made by Cordero, to implicate Downey in the Fraudulent Credit Card Charges. Downey finally contends Vitale and Local 1262 failed to conduct an adequate investigation into the Fraudulent Credit Card Charges in May 1995. Had Local 1262 and Vitale conducted an adequate investiga-

tion, Downey contends they would have questioned the indictment of Downey, discovered Downey was not derelict in his duties as bookkeeper and determined that he should not have been reduced to part-time status. Opposition Brief at 19–20.[14]

*Discussion*

### A. Standard of Review for Summary Judgment Motions

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether the Defendants are entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir. 1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party'") (citations omitted).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 & n. 2 (3d Cir.1983) the court must resolve "all inferences, doubts and issues of credibility ... against the moving party", *cert. dismissed,*

465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54 F.3d at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without Op'n,* 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Siegel,* 54 F.3d at

---

**14.** The Opposition Brief does not cite to a certifi cation to support these contentions.

1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

The dispute between the parties in the present case rests upon the threshold determination of whether Downey states a viable cause of action under Federal Labor Law. Viewed in a light most favorable to Downey, the evidence presented does not raise a genuine issue of material fact as to whether Downey failed to exhaust his intra-union remedies or whether his failure to do so is excused on the grounds · of futility.[15] The resolution of this threshold issue depends wholly upon the interpretation of contractual language and the applicable law. Consideration for the motions for summary judgment is therefore proper. Because Downey did not exhaust his intra-union remedies, summary judgment on the causes of action arising under 29 U.S.C. § 185 is granted in favor of the Defendants.[16] The remaining state law claims are dismissed without prejudice for lack of subject matter jurisdiction.

### B. *Requirements for Relief Under the Labor Management Relations Act*

The instant case may be classified as a hybrid suit arising under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. A hybrid suit is defined by the Supreme Court as the concurrent causes of action brought by an employee against a union and an employer. *DelCostello v. Int'l*

*Bhd. of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983). A suit against an employer arises under the LMRA as an alleged breach of the CBA. A cause of action against a union is implied under the LMRA as a breach of the duty of fair representation. *Id.,* at 164, 103 S.Ct. at 2290–91.

■ A hybrid suit against an employer and union must be brought within the six month statute of limitations, pursuant to § 10(b) of the LMRA, 29 U.S.C. § 160(b). *DelCostello,* 462 U.S. at 155, 103 S.Ct. at 2285–86; *Whittle,* 56 F.3d at 489. In order to bring a viable hybrid suit, an employee is also required to exhaust any grievance or arbitration remedy provided in the collective bargaining agreement. *DelCostello,* 462 U.S. at 163, 103 S.Ct. at 2289–90; *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); *Whittle v. Local 641, Int'l Bhd of Teamsters,* 56 F.3d 487, 490 (3d Cir.1995). The Vitale Defendants and Local 1262 argue Downey failed to bring his suit within the statute of limitations and did not exhaust his internal remedies. Accordingly, the Vitale Defendants and Local 1262 urge judgment as a matter of law.

### 1. *Statute of Limitations*

■ In order to determine whether Downey filed a timely lawsuit, it must first be determined when the statute of limitations began to run. The Supreme Court has instituted a case-by-case factual standard in determining when the statute of limitations for a hybrid suit begins to accrue. *Clayton v. Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am.,* 451 U.S.

---

**15.** The Opposition Brief and Downey Rule 56f Statement argue summary judgment is premature because, at the time of the original filing of the motions on 7 August 1996, discovery had not been completed. Opposition Brief at 2. The depositions of several witnesses had not been completed, including those of Heller, Smith and DuBose. The Downey Rule 56f Statement requested the court to enter a continuance of the motion until 23 September 1996 and requested the opportunity to submit a sur-reply. Downey Rule 56f Statement, ¶¶ 2, 20.

Due to problems with the submissions, the instant motions were filed on 29 August with a return date of 23 September. The motions are ·

granted on the basis of procedural facts, not substantive facts. Accordingly, the inability of Downey to answer the original motions without taking certain depositions or receiving the transcripts of certain depositions does not create any issue, much more a genuine issue, of material fact to preclude summary judgment.

**16.** Summary judgment is granted on the grounds that Downey failed to exhaust his internal remedies prior to bringing this lawsuit and, therefore, does not have a viable claim. A brief discussion of the statute of limitation argument is included, however the other arguments presented by the Defendants in support of summary judgment are not addressed.

679, 689–93, 101 S.Ct. 2088, 2095–98, 68 L.Ed.2d 538 (1981); *Scott v. Local 863, Int'l Bhd of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 725 F.2d 226, 228 (3d Cir.1984). The Third Circuit has held that the limitations period begins to run when plaintiff knows, or reasonably should have known, of the acts constituting the union's wrongdoing. *Miklavic v. USAir, Inc.*, 21 F.3d 551, 556 (3d Cir.1994); *Vadino v. A. Valey Engineers*, 903 F.2d 253, 260 (3d Cir. 1990) (quoting *Hersh v. Allen Products Co. Inc.*, 789 F.2d 230, 232 (3d Cir.1986)). *Arriaga–Zayas v. Int'l Ladies' Garment Workers' Union*, 835 F.2d 11, 13 (1st Cir.1987), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2016, 100 L.Ed.2d 604 (1988); *Scott*, 725 F.2d 226, 229 (3d Cir.1984).

The Vitale Defendants and Local 1262 argue Downey's suit was instituted beyond the six month statute of limitations. The Vitale Defendants and Local 1262 claim Downey knew, or should have known, about the alleged wrongdoing of Local 1262 on or before 2 August 1995. The Vitale Defendants and Local 1262 set forth several facts to support this contention.

Smith informed Downey of the Settlement Agreement on 21 July 1995. Several meetings were scheduled between Downey and Smith at which Downey was supposed to sign the Grievance Release. In accordance with the Settlement Agreement, Downey had been placed on the Hoboken Foodtown work schedule on or about 21 July 1995. The 27 July Letter, sent by Marcucci, requested a response from Downey by 2 August 1995 concerning the Settlement Agreement. On 2 August 1995, Downey rejected the Settlement Agreement. The Vitale Defendants and Local 1262 contend Downey should have been aware of the alleged wrongdoing of Local 1262, triggering the statute of limitations on or before 2 August 1995. The Vitale Defendants and Local 1262 claim, therefore, that 2 August 1995 is the latest accrual date for the statute of limitations and Downey's Complaint, filed 16 February 1996, was out of time.

While the 2 August Reply Letter from Downey did reject the Settlement Agreement, it is not clear it marked an accrual date triggering the running of the limitations period. The 27 July Letter indicated Local 1262 wanted a response from Downey by 2 August 1995 in order to decide how it would proceed. This language suggests that if Downey was not satisfied, Local 1262 may have continued to adjust the grievance. Downey's Counsel requested Local 1262 to communicate their intent to continue to help Downey within ten business days of 2 August 1995.

Phone calls between counsel for Local 1262 and counsel for Downey present questions of fact regarding whether the matter had been resolved or whether Local 1262 was still acting on behalf of Downey. Taking the facts most favorable to Downey, the earliest date the action could have accrued would be ten business days from 2 August 1995—16 August 1995. The latest date the action could have accrued would be 24 August 1995, when Downey received a letter from Simonoff, who indicated Local 1262 refused to request arbitration. In either scenario, the filing of the Complaint on 16 February 1996 was timely. Summary judgment on the basis of the statute of limitations is denied.

### 2. *Failure to Exhaust*

■ Under Federal labor law, an aggrieved employee must exhaust the procedures for grievance and arbitration under the CBA before commencing an action in Federal court. "An employee seeking a remedy for an alleged breach of the collective-bargaining agreement between his union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain a suit against his union or employer under § 301(a) of the Labor Management Relations Act...." *Clayton*, 451 U.S. 679, 681, 101 S.Ct. 2088, 2091 (1981); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055–56, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 184, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967); *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965) (unless an employee attempted to utilize the contractual procedures for settling his dispute with his employer, his indepen-

dent suit against the employer would be dismissed; *Wheeler v. Graco Trucking Corp.,* 985 F.2d 108, 112 (3d Cir.1993); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1537 (3d Cir.1992).

If a provision in the CBA permits the reactivation of a grievance after an appeal, an employer or union should be permitted to rely on that provision and defend the § 301 suit on the ground that the employee failed to exhaust internal union procedures. *Clayton,* 451 U.S. at 692 & n. 20, 101 S.Ct. at 2097 & n. 20. The policy behind the requirement is protection of the integrity of the collective bargaining process and the facilitation of private, rather than judicial, resolution of disputes arising from the CBA. *Clayton,* 451 U.S. at 687, 101 S.Ct. at 2094 (citing *Hines,* 424 U.S. at 567, 570–571, 96 S.Ct. at 1057–58, 1059–60). *See also United Parcel Serv., Inc. v. Mitchell,* 451 U.S. 56, 63, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) ("The grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government"). The Supreme Court has declined, however, to "impose a universal exhaustion requirement lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal procedures that may not be adequate to redress their underlying grievances." *Local Union No. 1075, United Rubber Cork, Linoleum and Plastic Workers of Am, AFL–CIO v. United Rubber Cork, Linoleum and Plastic Workers of Am, AFL–CIO,* 716 F.2d 182, 185 (3d Cir.1983) (citing *Clayton,* 451 U.S. at 689, 101 S.Ct. at 2094–95).

Discretion is employed to decide when exhaustion by an employee is required. *Clayton,* 451 U.S. at 689, 101 S.Ct. at 2094–95 (citing *National Labor Relations Bd. v. Marine Workers,* 391 U.S. 418, 426 & n. 8, 88 S.Ct. 1717, 1722 & n. 8, 20 L.Ed.2d 706 (1968)). This discretion is narrowed by consideration of, at least, three relevant factors. *Id.* Exhaustion will not be required where 1) union officials are so hostile to the employee that the employee could not hope to obtain a fair hearing on the claim 2) the internal union procedures would be inadequate to either reactivate the employee's grievance or to award the employee the full relief sought under § 301 of the LMRA or 3) the exhaustion of internal procedures would be an unreasonable delay of the employee's opportunity to obtain a judicial hearing on the merits. *Id.* The reasonableness of the procedure is paramount. *United Rubber,* 716 F.2d at 186 (citations omitted).

The union bylaws of Local 1262 require a member to exhaust all internal remedies before instituting an external action. Article III, Section D of the Official Bylaws of United Food and Commercial Workers Local 1262, AFL–CIO ("Local 1262 Bylaws") provides:

> No member shall institute an action outside the Union against the International Union, Local Union or any of their officers or representatives without first exhausting all remedies provided by the Local Union bylaws and rules and the Constitution of the International Union.

Local 1262 Bylaws, attached to Nardone Cert. as Exhibit 37; attached to Arturi Cert. as Exhibit H; attached to Gaudioso Cert. as Exhibit G. The Local 1262 Bylaws expressly permit a member of the union to appeal the disposition of his or her grievance.

> Section A. The Local Union shall have the exclusive authority to interpret and enforce the collective bargaining contract. In accordance therewith, the Local Union shall have the exclusive authority to submit grievances to arbitration, withdraw grievances, settle and compromise grievances, and decline to invoke grievance procedure of a collective bargaining contract.

> Section B. Any member who disagrees with the disposition of his or her grievance by the Local Union President, or the Local Union President's designated representative, shall have the right to appeal the decision to the Local Union Executive Board.

> Section C. The member shall submit the appeal within [fifteen] days from the date the member is first advised of the

Local Union's disposition of the member's grievance.

Section D. The Local Union Executive Board shall consider the appeal at the next regular meeting of the Executive Board. The Executive Board shall treat the appeal as either a request for a review or a request for reconsideration.

Section E. The Executive Board shall advise the member of its decision within 30 days from the date of its meeting. There shall be no further appeal from the decision of the Executive Board.

Section F. Any member who does not appeal the Local Union's disposition of the member's grievance as provided above shall be deemed to have acquiesced in said disposition.

Local 1262 Bylaws, Article XV.

Grievance and arbitration procedures are also set forth in Article 14 of the Agreement Between UFCW Local 1262, AFL–CIO, and Foodtown Supermarkets (the "Vitale CBA"). Vitale CBA, attached to Nardone Cert. as Exhibit 36; attached to Arturi Cert. as Exhibit K; attached to Local 1262 Appendix as Exhibit J. Article 14 of the Vitale CBA requires union officials from Local 1262 to confer with designated representatives of Vitale to address and adjust the dispute or grievance. *Id.* If the grievance cannot be satisfactorily resolved, then either the union officials from Local 1262 or the representative from Vitale may submit the master to a mutually agreed upon impartial arbitrator:

> In order to comply with the Union's internal appeal procedure, the Union shall have ninety (90) days from the date of the initial

filing to notify the Employer that it *may* go to arbitration.

Vitale CBA, Article 14, Section 4 (emphasis added). The right to demand arbitration is solely that of Vitale or Local 1262.

■ It is undisputed that Downey did not exhaust his intra-union remedies. Downey contends he had no duty to exhaust his intra-union remedies because Local 1262 had breached its duty of fair representation and, therefore, exhaustion would have been futile. Opposition Brief at 34.[17] Downey asserts the second *Clayton* consideration is controlling in this case because the intra-union appeal process could not give Downey the relief he sought—reinstatement of full-time status and complete back pay. Opposition Brief at 35. Downey reasons that, pursuant to the terms of the Vitale CBA, Local 1262 was required to notify Vitale of its intent to proceed to arbitration within ninety days of the filing of the grievance. The grievance was filed on 7 June 1995. Therefore, "the deadline to proceed to arbitration, and thereby reactivate the grievance, was [5 September 1995]." *Id.*

Downey further argues, pursuant to the Local 1262 Bylaws, he could only appeal the Local 1262 decision within fifteen days of when he was first advised of the resolution of the grievance. Local 1262 Bylaws, Article 15. According to Downey, he did not know until the 24 August Simonoff Letter that Local 1262 saw "no reason to go to arbitration for an employee who can have his job back plus $2,000 and who is refusing to return to that job." Nardone Cert. at Exhibit 29. Based on this accrual date, Downey had until 9 September to appeal to the Local Union Executive Board (the "Executive Board").[18]

---

**17.** The Opposition Brief suggests Downey should not be barred for failing "to exhaust an administrative remedy he did not know about." Opposition Brief at 34. Local 1262 Bylaws indicate that every member, upon request, shall be given a copy of both the Vitale CBA, the Local 1262 Bylaws and the International Constitution. Article XVI, Local 1262 Bylaws; 26 March 1996 Affidavit of Russell Atkin, attached to Gaudioso Cert. as Exhibit I; March 1996 Affidavit of Frank Margiotta, attached to Gaudioso Cert. as Exhibit I, ¶ 1. Downey, and his counsel, had access to these documents and to the grievance appeal procedures. *See Hersh v. Allen Prod. Co., Inc.,* 789 F.2d 230, 232 (3d Cir.1986); *Balsavage v. Ryder Truck Rental, Inc.,* 712 F.Supp. 461, 473

(D.N.J.1989) (employee is under a duty of due diligence, which means "familiarity with the collective bargaining agreement, and the making of such inquiries as would be reasonably calculated to acquire the pertinent information concerning the union's breach").

**18.** The Defendants contend Downey knew of the resolution of the grievance at an earlier date, on 2 August 1995. Local 1262 Reply Brief at 13. In a summary judgment motion, the facts are considered in the light most favorable to the non-moving party. *Healey,* 78 F.3d at 130–31. Accordingly, the 24 August 1995 date will be used. There is strong indication in the record, howev-

The Board did not have to address the appeal until the next regularly scheduled meeting.[19] Local 1262 Bylaws, Article 15. The Board had an additional thirty days to decide the appeal. *Id.* Downey argues that if he filed his appeal on 9 September 1995, he was already passed the 5 September 1995 deadline, "too late to reactivate Downey's grievance and proceed to arbitration...." Opposition Brief at 36. Downey claims this is the "exact fact pattern in *Clayton* where the employee's time to proceed to arbitration would have expired before the intra-union appeals process was completed." *Id.*

*Clayton,* however, is distinguishable on its facts. In *Clayton,* the time to proceed to arbitration had expired when the employee *first learned* of the final resolution of the grievance. Accordingly, arbitration could not have been demanded even if the internal appeal had reactivated the grievance. In his § 301 suit, Clayton sought reinstatement and back pay, which could not be obtained because the CBA did not vest the union with the power to order reinstatement. The *Clayton* Court held that where the internal procedures can result in "either complete relief to an aggrieved party or reactivation of a grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual disputes." *Clayton,* 451 U.S. at 692, 101 S.Ct. at 2097. Where an aggrieved party cannot obtain the substantive relief he seeks, however, exhaustion would be futile. *Id.* at 693, 101 S.Ct. at 2097.

Downey has not established that pursuing the internal appeal procedures would have been a fruitless gesture. Unlike the grievant in *Clayton,* Downey had time (more than a week if employing the 24 August 1995 date supplied by Downey) to institute an appeal to the Executive Board before the expiration of time when Local 1262 had to notify Vitale that it *may* proceed to arbitration. The Vitale CBA does not require the arbitration to proceed by the ninetieth day following the entrance of a grievance. Rather, Local 1262 has ninety days to notify Vitale that it *may* go to arbitration "in order to comply with Union's internal appeal procedure." Vitale CBA, Article 14, Section 4(d).

Downey does not address the situation whereby Local 1262 could have notified Vitale that it *may* go to arbitration, pending the outcome of Downey's appeal procedure. The Vitale CBA does not compel the arbitration to be complete by 5 September 1995, nor does it compel the commencement of the arbitration proceeding by 5 September 1995. Downey had time to file an appeal before the time for notification of arbitration had expired.[20] Downey has not demonstrated that the appeal procedure was inadequate to reactivate his grievance. Downey has not demonstrated that he is excused from his failure to exhaust the intra-union appeal procedure,

er, that Downey believed his grievance to be resolved before 24 August 1995, triggering the start of the time to appeal. First, Downey had appointments with Smith on several days in late July to sign the Grievance Release to acknowledge his acceptance of Settlement Agreement. Second, Downey had been placed on the schedule at Hoboken Foodtown in accordance with the Settlement Agreement as early as 21 July 1995. Third, Smith alleges he spoke with Downey on 26 July 1995 and told him that, as far as Smith was concerned, the grievance had been resolved. Finally, Downey felt the need to retain an attorney as early as 21 July 1995 to protect his interests. These facts suggest Downey had recognized Local 1262 believed the grievance had been adjusted before the 24 August Simonoff Letter.

19. A schedule of dates for the regular Executive Board meetings was not provided in the record. For the basis of his argument, Downey assumes that a regularly scheduled meeting of the Executive Board did not occur until 9 September 1995, after the 5 September 1995 arbitration deadline. The Local 1262 Bylaws indicate the President of the union is authorized to call additional meetings of the Executive Board whenever it is deemed advisable. Local 1262 Bylaws, Article VIII.

20. Downey contends even if he pursued the intra-union appeal process, it would not give Downey the relief he sought—reinstatement of full-time status and back pay—due to the time restriction in requesting arbitration. The more reasonable viewpoint is that Downey had a greater chance of obtaining the relief he sought through intra-union appeal, rather than bringing a § 301 suit. The internal appeal would have taken only a few weeks for a resolution. The appeal would have allowed for review and reconsideration of Downey's grievance. Downey's suit, however, will not result in reinstatement. Downey's Complaint does not request reinstatement, only compensatory and punitive damages.

which would have resulted in review and reconsideration of his grievance.[21]

■ Downey also seeks reprieve from the exhaustion requirement on the ground that the exhaustion rule "works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such discriminatory, dishonest, arbitrary or perfunctory fashion such as to breach its duty of fair representation." Opposition Brief at 36–37 (citing *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290–91). Downey argues that an employee may be excused from pursuing internal or private proceedings whenever the union breaches its duty of fair representation, which, Downey contends, the courts have equated with futility. Opposition Brief at 37 (citing *Balsavage*, 712 F.Supp. at 467).[22]

■ If an employee can prove that the union breached its duty of fair representation, a wrongfully discharged employee may bring an action against his employer despite failing to exhaust the administrative remedies. *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). In *Vaca*, the union arbitrarily, capriciously and without reason refused to take the grievance to arbitration under the fifth step of the bargaining agreement procedures. *Id.* at

173, 87 S.Ct. at 907–08. The union had the sole power to invoke the higher grievance procedures and wrongfully refused to do so. Accordingly, the employee was excused from exhausting the internal procedures. *Id.* at 185, 87 S.Ct. at 914.

■ Downey contends Local 1262 breached its duty of fair representation, excusing him from exhausting the internal appeal procedures. Opposition Brief at 36–38. A breach of the duty of fair representation requires a demonstration that the "union's actions are arbitrary or discriminatory where it ignores or perfunctorily handles grievances or where its acts or omissions reflect reckless disregard for the rights of the individual employee." *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 618 (9th Cir.1981) (citations omitted).

In the instant case, Local 1262 did not arbitrarily refuse to press the grievance of Downey, but pursued it to what it considered to be an adequate Settlement Agreement with Vitale. The Smith and DuBose Affidavits demonstrate Local 1262 actively processed Downey's grievance. Local 1262 met with Vitale representatives, investigated the evidence against Downey and arrived at a resolution with Martin Vitale, Vitale President and CEO. The result of Local 1262

---

21. The Vitale Defendants and Local 1262 claim the right to demand arbitration was that of Local 1262 and not of Downey. The Vitale Defendants and Local 1262 contend Downey's argument that the appeal would be futile because it could not be completed in time to demand the arbitration relief is irrelevant. The Vitale Defendants and Local 1262 contend Downey could not have demanded arbitration in any event. Downey's argument does not fail, however, because he did not have the personal right to demand arbitration. Downey's argument fails on the ground that he did not file an appeal at all, despite the existence of time for Local 1262 to notify Vitale that arbitration *may* occur. In *Clayton*, the right to demand arbitration was that of the union, not the grievant. *Clayton*, 451 U.S. at 682 & n. 1, 101 S.Ct. at 2091–92 & n. 1. The Court held the internal procedures were inadequate because the period to request arbitration had expired when Clayton first received notice of the union's decision not to pursue the grievance. When Downey first received notice of the decision of Local 1262 not to proceed, there was still time to request arbitration.

22. *Balsavage,* and the other cases cited by Downey to support this contention (*Carrington v. RCA Global Communications, Inc.,* 762 F.Supp. 632, 637 (D.N.J.1991); *Proudfoot v. Seafarer's Int'l Union,* 779 F.2d 1558, 1559 (11th Cir.1986) and *Adkins v. Int'l Union of Elec. Radio & Mach. Workers,* 769 F.2d 330, 336 (6th Cir.1985)), address exhaustion of the grievance procedure in the context of deciding whether the claim before the court had accrued, triggering the statute of limitations.

In the last case cited by Downey to support this contention, *Boone v. Armstrong Cork Co.,* 384 F.2d 285, 288, 291–292 (5th Cir.1967), the Fifth Circuit addressed the question of whether the plaintiff could maintain a suit in view of the fact the grievance procedure had not been used. The failure to resort to the grievance procedure was due to a general misunderstanding among all of the parties as to the availability of the procedures. *Id.* at 290. Acknowledging the strong policy of favoring resolution of grievances under contractual procedures, the Fifth Circuit suspended the judicial proceedings until the parties had an opportunity to exhaust the grievance procedure. *Id.* at 292.

efforts was reinstatement of Downey and recovery two-thirds back pay.

Downey does not dispute that a Settlement Agreement had been reached, but alleges the settlement was inadequate because Local 1262 relied on the misleading information provided to them by Vitale. Downey contends Local 1262 failed to conduct "the most rudimentary investigation concerning the events that led to Downey's discharge from Kearny Foodtown on 2 June 1995." Opposition Brief at 25–26. Downey contends a more thorough investigation would have revealed that the genesis of the criminal charges against Downey were lodged by Vitale. Downey argues a more thorough investigation would have shown that there were no formal company accounting procedures in place, the non-compliance of which would have justified a reduction in back pay. Downey also argues an investigation would have demonstrated that no other bookkeepers who were on duty on the days Cordero was stealing were questioned or sanctioned, that a manager was not needed to override a manually entered credit card and that Cordero could have obtained the three digit code of another cashier without the help of a bookkeeper. Finally, Downey argues that if Local 1262 had investigated the grievance more thoroughly, it would have uncovered evidence to show Downey was not the least senior employee warranting the reduction to part-time status. Opposition Brief at 26–30.

The Vitale CBA indicates "[t]he employer agrees to supply the Union with the relevant information necessary to process the grievance." Vitale CBA, Article 14, Section 2. If the information was misleading or lacking, Downey could have presented his concerns to the Executive Board for review and reconsideration. The issues could have been addressed there first, and more quickly. Moreover, any opposition Downey had with respect to the reduction to part-time status, could have been addressed in an additional grievance instituted after his reinstatement to the Hoboken Foodtown.

Downey has not presented evidence sufficient from which a trier of fact could determine that Local 1262 had perfunctorily dismissed his grievance, discriminated against Downey or arbitrarily refused to investigate his grievance to warrant the failure to exhaust his intra-union remedies. *See Hendricks v. Edgewater Steel Co.*, 898 F.2d 385 (3d Cir.1990) (union member failed to show that union acted perfunctorily or arbitrarily in refusing to investigate grievance in order to invoke exception to requirement of exhaustion of union remedies). If Downey disagreed with the Settlement Agreement, he had the obligation to pursue an appeal to the Executive Board to review and reconsider the decision, before instituting a lawsuit. Indeed, the Local 1262 Bylaws indicate a grievant is deemed to have acquiesced in the disposition of the grievance if no appeal is filed. Local 1262 Bylaws, Article XV, Section F.

■ Under the Local 1262 Bylaws, Local 1262 had the exclusive discretion to submit grievances to arbitration, withdraw grievances and decline to invoke the grievance procedures. Local 1262 Bylaws, Article XV. An individual employee does not have the absolute right to have his or her grievance taken to arbitration. *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. Nor does a union breach its duty of fair representation merely because it failed to take the grievance to arbitration. *Id.*

Viewed in a light most favorable to Downey, the facts fail to demonstrate how an appeal to the Executive Board would have be futile. As discussed, rather than instituting the instant suit, Downey should have made an appeal before the Executive Board. The Local 1262 Bylaws indicate the Executive Board is made up of the constitutional officers of the Local Union. Local 1262 Bylaws, Article VIII. There is no evidence to suggest the Executive Board would not have made a fair and independent assessment of Downey's claim.[23]

---

23. The Local 1262 Moving Brief states that Local 1262 generally prohibits paid Local 1262 officers and staff from deciding the appeals of the disposition of a grievance. Local 1262 Moving Brief

at 14–15. Instead, the appeal is determined by eighteen rank and file members of Local 1262 who are Vice Presidents and who are employed in the supermarkets and stores represented by

The parties did not address the third *Clayton* consideration for excusing the failure to exhaust administrative remedies. That consideration excuses exhaustion of internal union appeals where the appeal would result in unreasonable delay of the opportunity of the employee to obtain a judicial hearing. Because this suit is still pending more than a year since the filing of the grievance, as compared to a few weeks in the internal union appeal procedures, a discussion of this consideration is not merited.

Downey did not exhaust his internal appeal procedures before bringing this suit. Downey presented no evidence from which a trier of fact could determine that the union had perfunctorily dismissed his suit to relieve him of the duty to exhaust the internal remedies by appealing to the Executive Board. Accordingly, the Vitale Motion for Summary Judgment and the Local 1262 Motion for Summary Judgment are granted.

### C. *Dismissal of State Law Claims*

Downey failed to exhaust his internal union appeal procedures prior to instituting this lawsuit. Downey failed to establish any reasons to excuse himself from the exhaustion requirement. Downey is therefore precluded from bringing a cause of action against Vitale and Local 1262 under § 301 of the LMRA, 29 U.S.C. § 185, which is the only basis for Federal subject matter jurisdiction in this action. *See Wheeler*, 985 F.2d at 112. Pursuant to 28 U.S.C. § 1367(c)(3), the remaining state law causes of action brought by Downey will be dismissed, without prejudice. *See* 28 U.S.C. § 1367(c)(3).

 Section 1367(c)(3) of title 28 provides, in relevant part,

> The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all

claims over which it has original jurisdiction.

28 U.S.C. § 1367(c)(3). Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right. *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966)). If the claim over which the district court has original jurisdiction is dismissed, the district court should decline to decide the pendent state claims, absent considerations of judicial economy, convenience, and fairness to the parties. *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277 (3d Cir.1993); *Lovell Mfg., a Div. of Patterson–Erie Corp. v. Export–Import Bank of the United States*, 843 F.2d 725 (3d Cir.1988).

 As a matter of comity, decisions of state law by the Federal courts should be avoided. If Federal claims are dismissed before trial, then the state law claims should be dismissed as well. *Borough of West Mifflin*, 45 F.3d at 788; *Stokes v. Local 116 of Int'l Union of Electronic, Elec., Salaried, Mach. and Furniture Workers*, No. Civ.A. 92–3131, 1993 WL 23895, at *1 (E.D.Pa., Feb. 02, 1993); *Nicandro v. Berkeley Farms, Inc.*, No. C 93–2317 SBA, 1994 WL 705267, at *1 (N.D.Cal. Dec. 14, 1994); *Hebert v. Post Machinery Co.*, 495 F.Supp. 285 (D.N.H.1980).

Accordingly, Downey's state law claims are dismissed without prejudice. A determination of whether any of the state law claims brought by Downey are preempted under the LMRA is reserved for the state tribunal.

### D. *Vitale Request for Rule 11 Sanctions*

In addition to the Motion for Summary Judgment, the Vitale Defendants submitted the Vitale Motion for Sanctions against counsel for Downey pursuant to Fed.R.Civ.P. 11 ("Rule 11"). The Vitale Defendants submitted the application within their Motion for

the Local 1262. Local 1262 Moving Brief at 14, Vitale Moving Brief at 15. The Vitale Defendants and Local 1262 point out these individuals can, and have, reversed the decision of paid officers of Local 1262 in the past. Local 1262 Moving Brief at 15. In support of these contentions, Local 1262 cites to paragraphs 9 to 15 of the Affidavit of Louis Marcucci, which they indicate is attached as Exhibit K to the Local 1262

Brief. The Exhibit K filed with the Clerk's Office in support of the instant motions, however, consists of the 13 August 1996 Affidavit of Louis Marcucci. This Affidavit contains only seven paragraphs and does not describe the Executive Board as referenced in the brief. Therefore, the information regarding the composition of the appeal board was not regarded as fact in the determination of the instant motions.

Summary Judgment. Rule 11 requires that "[a] motion for sanctions ... shall be made separately from other motions or requests...." Rule 11; *Omega Sports, Inc. v. Sunkyong Am., Inc.,* 872 F.Supp. 201, 203 (E.D.Pa.1995). The Vitale Defendants admit they violated Rule 11 by submitting the Vitale Motion for Sanctions with the Vitale Motion for Summary Judgment.

By way of explanation, the Vitale Defendants cite Rule 12L of the General Rules for the District of New Jersey ("Rule 12L"). Rule 12L states:

> All applications for sanctions pursuant to Rule 11 or 37 of the Federal Rules of Civil Procedure shall be filed with the Clerk prior to any entry of final judgment notwithstanding the provisions of any other Rule of this Court.[24]

Rule 12L. The Vitale Defendants are seeking final judgment in their Motion for Summary Judgment. They contend that if they did not submit the Vitale Motion for Sanctions with the Vitale Motion for Summary Judgment, they would risk forfeiting their right to move for sanctions. While this contention may be accurate, the Vitale Defendants themselves were responsible for setting the timing and pace of this motion. Indeed, with a little foresight, the Vitale Defendants could have submitted a Motion for Rule 11 Sanctions and then filed the Motion for Summary Judgment.

Notwithstanding the requirement of a separate motion, it is not clear sanctions are warranted in this action. The Vitale Defendants contend Rule 11 sanctions in the form of attorney's fees and cost of suit are appropriate because of the frivolous nature of Downey's action. Vitale Moving Brief at 28–29. The Vitale Defendants argue there is no fact upon which Downey can rely "beyond bare allegations" to prove Local 1262 breached its duty of fair representation. *Id.* at 30. The Vitale Defendants argue a reasonable inquiry into the facts and law of the action would have revealed that an LMRA claim would not succeed. The Vitale Defendants

contend, therefore, that Rule 11 sanctions are proper.

The standard for imposing Rule 11 sanctions is one based upon objective reasonableness under the circumstances. Bad faith on the part of the plaintiff is not required. *Martin v. Brown,* 63 F.3d 1252, 1264 (3d Cir.1995) (citations omitted). Sanctions are appropriate only if "the filing of the complaint constituted abusive litigation or misuse of the court's process." *Simmerman v. Corino,* 27 F.3d 58, 62 (3d Cir.1994) (citing *Teamsters Local Union No. 430 v. Cement Express, Inc.,* 841 F.2d 66, 68 (3d Cir.), *cert. denied sub nom., Herman Bros., Inc. v. Teamsters Local Union No. 430,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988)). "[T]he mere failure of a complaint to withstand a motion for summary judgment or a motion to dismiss should not be thought to establish a rule violation." *Simmerman,* 27 F.3d at 62; *see also Arab African Int'l Bank v. Epstein,* 10 F.3d 168, 175 (3d Cir.1993).

The Vitale Motion for Summary Judgment and the Local 1262 Motion for Summary Judgment were granted based upon a procedural defect, not on the substantive merits of Downey's claims. Rule 11 sanctions are reserved only for claims that are patently unmeritorious or frivolous. *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988). The claims of Downey do not fall within that classification. The Vitale Motion for Sanctions is denied.

### Conclusion

For the reasons stated, the Vitale Motion for Summary Judgment and the Local 1262 Motion for Summary Judgment are granted. The state law claims brought by Downey are dismissed without prejudice. The Vitale Motion for Sanctions is denied.

---

**24.** The General Rules define "Rule" as a rule under the General Rules, not under the Federal Rules of Civil Procedure.